IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARY ALBRITTON, as next friend of CODY ALBRITTON, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § § | CIVIL ACTION NO. 3:23-cv-1723 |
| HENDERSON COUNTY, TEXAS; PHILIP R. TAFT, PSY.D; PHILIP R. TAFT PSY.D & ASSOCIATES, PLLC; and SOUTHERN HEALTH PARTNERS, INC., | § § § § § | |
| *Defendants*. | § § § | |

_____

**PLAINTIFF'S ORIGINAL COMPLAINT**

_____

Roger Topham
State Bar #24100557
13809 Research Blvd. Suite 500
Austin, Texas 78750
(512) 987-7818
rt@tophamlaw.com

***Attorney for Plaintiff***

## TABLE OF CONTENTS

PLAINTIFF'S ORIGINAL COMPLAINT ................................................................. i

I.   INTRODUCTION ............................................................................................ 1

II.  PARTIES ........................................................................................................ 3

III. JURISDICTION AND VENUE ...................................................................... 3

IV.  FACTUAL ALLEGATIONS .......................................................................... 4

*Cody Albritton Was Subjected to Grossly Inhumane Conditions* ..................... 4

*The County and Taft Willfully Deprived All Inmates at the Jail of Access to Any Mental Health Care* ..................................................................................... 11

*Medical Staff Completely Failed to Monitor Cody's Health* ........................... 17

V.   FIRST CAUSE OF ACTION: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ................................................................................ 20

VI.  SECOND CAUSE OF ACTION: VIOLATION OF INMATE'S RIGHTS UNDER 42 U.S.C. § 1983 ................................................................................ 24

*The Taft Defendants* ......................................................................................... 24

*Henderson County* ........................................................................................... 26

VII. THIRD CAUSE OF ACTION: NEGLIGENCE ............................................. 26

*The Taft Defendants* ......................................................................................... 26

*Taft: Gross Negligence* .................................................................................... 27

*SHP* .................................................................................................................. 28

VIII. DAMAGES ................................................................................................... 29

IX.  JURY DEMAND ........................................................................................... 29

X.   RELIEF REQUESTED .................................................................................. 30

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Mary Albritton, as next friend of Cody Albritton, files this Original Complaint against Henderson County, Texas; Philip R. Taft, Psy.D (individually); Philip R. Taft Psy.D & Associates, PLLC; and Southern Health Partners, Inc. ("SHP").  Plaintiff would respectfully show the Court the following:

## I.    INTRODUCTION

1.    Cody Albritton has faced challenges his entire life that most people simply could not imagine.  He was 37 at the time of the incident forming the basis of this lawsuit, but has the "mental age" of approximately a 6-year-old.  He has an IQ of approximately 35.  His ability to communicate verbally is impaired to the point that his disability is obvious to anyone who speaks with him.  Not only is he intellectually disabled, but he also deals with severe psychiatric disorders, including schizo-affective disorder (bipolar type), obsessive-compulsive disorder, and chronic insomnia.  As if these obstacles were not enough, Cody was also born with a serious heart condition and continues to suffer today from cardiomyopathy and chronic systolic heart failure.

2.    When Cody was taken to the Henderson County Jail as a result of an unsuccessful mental health intervention, he was placed in the so-called "violent cell" and subjected to barbaric conditions for approximately 42 hours.  This completely stripped cell contains no toilet or running water of any kind, and Cody was never let out to use a toilet or take a shower.  He was denied all of his medications, directly contradicting doctor's orders.  The lights were left on all night, and no bedding whatsoever was provided, making sleep impossible.  Perhaps most shockingly, Cody was not provided any water or other liquids for at least 32 consecutive hours while he was in the violent cell.

1

3.      This time in the violent cell was an unspeakable horror for Cody, who did not comprehend what was happening.  Having his psychiatric medications suddenly and completely withdrawn made it much worse.  He hallucinated that his parents were dead and thought he would never go home again.  All the while, jail staff knew that Cody was severely disabled; yet, instead of arranging appropriate help, they left him to rot in the violent cell like an animal without any medical attention or the most basic of human necessities.

4.      The jail—which contracted with Taft and SHP to provide mental health and medical care, respectively—has no policies in place regarding the proper treatment of and/or accommodations for arrestees with severe mental health issues or intellectual disabilities.  In fact, the jail does not provide any access to mental health care whatsoever: Taft, the contracted psychologist, assigned his duties to provide psychological services to a single person who is unqualified to provide those services under both Texas law and recognized national standards.  As a result, all determinations of how to treat and house such individuals are left entirely to the discretion of correctional officers, who have no mental health training whatsoever and are wholly unqualified to make such determinations.

5.      In addition to multiple, specific instances of discrimination against Cody, this willful, wholesale failure to address the serious mental health needs of an entire subset of the jail's population intentionally discriminates against those individuals in violation of the Americans with Disabilities Act.  It also creates unconstitutional conditions of confinement in violation of the Civil Rights Act of 1871.  Taft may also be liable for his negligent failure to provide qualified mental health care to Cody.  SHP was negligent in failing to provide Cody with any of his prescribed medication and failing to monitor his health while he was confined at the jail.

## II.    PARTIES

6.    Plaintiff Mary Albritton is a resident of the State of Texas.  Ms. Albritton is named under Rule 17 as next friend to Cody Albritton, whose disabilities render him incompetent to represent himself in this matter.  Cody has lived with Mary, under her and his father's care, for his entire life, but has had no duly appointed guardian since he became an adult.

7.    Defendant Philip R. Taft, Psy.D & Associates PLLC is a Texas corporation based in Corsicana, Texas.  It may be served with process at his place of business, located at 715 W. 2nd Avenue, Corsicana, TX 75110.

8.    Defendant Philip R. Taft is a resident of the State of Texas.  He may be served with process at his place of business, located at 715 W. 2nd Avenue, Corsicana, TX 75110.

9.    Defendant Henderson County is a political subdivision of the State of Texas and may be served with process through its chief executive, County Judge Wade McKinney, 125 N. Prairieville St. #100, Athens, TX 75751.

10.    Defendant SHP is a Delaware corporation with its headquarters located in Tennessee.  SHP may be served with process through its registered agent, CT Corporation System, 1999 Bryan St. Suite 900, Dallas, TX 75201.

## III.    JURISDICTION AND VENUE

11.    The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983, as well as the Americans with Disabilities Act, 42 U.S.C. § 12132.  Supplemental jurisdiction over state law claims against SHP and the Taft Defendants is proper under 28 U.S.C. § 1367 because those claims are so related to the claims under § 1983 that they are part of the same case.

3

12.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(1) because the Taft Defendants reside in the Northern District of Texas, and all Defendants reside in Texas.  SHP resides in Texas by virtue of 28 U.S.C. § 1391(c)(2); the State of Texas may exercise specific personal jurisdiction over SHP, a corporation, because its conduct within Texas gave rise to these claims.

## IV.     FACTUAL ALLEGATIONS

### *Cody Albritton Was Subjected to Grossly Inhumane Conditions*

13.     Cody Albritton was 37 at the time of the incident forming the basis of this lawsuit, but has the "mental age" of approximately a 5-year-old.  He has an IQ of approximately 35.  His ability to communicate verbally is impaired to the point that his disability is obvious to anyone who speaks with him.

14.     Cody also deals with severe psychiatric disorders, including schizo-affective disorder (bipolar type), obsessive-compulsive disorder, and chronic insomnia.

15.     Cody was also born with a serious heart condition; he suffered a stroke when he was just three years old and underwent heart surgery at age four.   Cody continues to suffer today from cardiomyopathy and chronic systolic heart failure.

16.     These conditions require an array of daily medications—approximately 18 different prescriptions.  Without these medications, the effects of Cody's various disorders have a strong negative synergy, working together to put him in notable danger and a generally miserable state. For example, without his regular heart medication, his heart can go into atrial fibrillation (arrhythmia), which can be frightening for anyone, but is especially so for Cody because his intellectual disability prevents him from understanding what is happening.   This fear and frustration, in turn, can trigger the effects of his schizo-affective disorder.

4

17.    Some days are more difficult than others for Cody.  January 17, 2022 was one of those days.  An episode of uncontrollable and disruptive behavior forced his mother, Plaintiff Mary Albritton, to call for help.  She wanted emergency medical services to come out to calm Cody down, but law enforcement officers responded instead.

18.    The officers failed to de-escalate the situation.  Fearing the officers might tase Cody, which could potentially kill him due to his heart condition, Mary approached Cody and tried to calm him down.  Cody became increasingly agitated and eventually swung a pair of pliers at Mary.  This prompted the officers to forcefully detain Cody and ultimately arrest him.

19.    Before taking Cody to the Henderson County Jail, the officers brought him to a hospital for medical clearance.  The doctor was mostly unable to examine Cody, due to his highly agitated state.  Rather than having Cody admitted to the hospital, the doctor cleared him to be taken to jail because, he explained, "I feel like my job is to medically clear him because the police want to keep him."

20.    The doctor did, however, provide the officers with a signed order for the jail to continue giving Cody his regular prescribed medications, along with a complete list of those medications.  Concerned about her son, Mary Albritton went to the jail when Cody was booked in.  She provided Cody's medications to an SHP nurse and tried to explain his various conditions to the nurse and other jail staff.  These staff members were not interested, however, and told Mary to leave.

21.    Upon arrival at the jail, Cody had no idea what was happening to him.  A group of jailers threw him on the floor, choked him, and repeatedly kicked him while attempting to get him into the so-called "violent cell."[1]

---

[1] Cody was in custody from approximately 10 p.m. on January 17, 2022, through approximately 3:30 p.m. on January 19.  In response to a public information request, the County provided the last

22.    The violent cell has no bed, sink, toilet, shower, or running water of any kind; the only place for an inmate to urinate and defecate is into a drain in the middle of the floor.  Toilet paper was never provided.  The cell also perpetually reeks of human waste.

23.    Exacerbating this situation was the fact that there was no place for Cody to wash his hands.  This continued for the entire time Cody was in isolation, since he was never once allowed to leave his cell.

24.    No bedding was provided, including a simple mattress or pillow, so Cody could only attempt to sleep directly on a small concrete slab built into the wall.  Cody's ability to sleep was also severely inhibited by correctional staff leaving the very bright lights in the cell on at maximum brightness at all hours of the day and night.  This kind of intentional sleep deprivation is cruel for anyone, but it is even worse for someone with chronic insomnia, like Cody.  And in fact, Cody did not sleep at all on either of the two nights he was held at the jail.

25.    There are no records of correctional or medical staff making any observations of Cody to check his status, despite a notation in his medical chart that he was supposed to be checked by medical staff every six hours.

26.    Cody was not provided anything to drink until early morning on January 18, when breakfast was served.  At that time, Cody had not slept.  He was also mentally and physically unravelling from not having any of his medications since he was arrested the previous day.  He had no idea what was happening—again, Cody views the world as a small child would—and was

---

32 hours of video from the time Cody was in custody at the jail (from 7:30 a.m. on January 18 through his release).  The County also provided about twenty minutes of footage showing Cody's arrival at the jail, but the subsequent 9.5 hours of video were not provided.  When asked about the missing footage, the County offered no reason for its omission, but claimed that it did not have it.  This explanation is not credible, since it was able to provide footage from both before and after the missing time period.  It should be presumed that the missing footage was intentionally destroyed.

terrified that he would never get to go home again.  He had also been hallucinating that his parents were dead.  Due to his fearful and distressed state of mind, caused by his mental disabilities, he believed the guards were trying to poison him.  As a result, he slapped the food and drink from an officer's hands when he attempted to pass it through a slot in the cell door.  This kind of reaction is a typical manifestation of Cody's schizo-affective disorder and intellectual disability, which prevent him from understanding the world around him (and in particular, frustrating, unusual, or adverse circumstances) in the same way a person without his disabilities would.  After that, correctional officers never again offered Cody any water or other beverages—in other words, Cody went more than 42 hours without anything to drink.

27.    Cody also did not eat anything the entire time he was at the jail.  The guards did not provide him any food at lunch on the 18th.  Food was placed in his cell at dinner time on the 18th, but was removed about an hour later untouched.  A box was again placed in the cell for breakfast on the 19th, but was removed approximately 30 seconds later.  Nothing was offered for lunch on the 19th.  Even on the occasions described above when the guards did offer food, they did not offer anything to drink.

28.    At some point in the first hours of custody, Cody had diarrhea.  He either did not understand that he was supposed to use the drain, or did not get there in time, because it ended up in a pool on the bench.  This pool of diarrhea sat there for nearly two days and was not cleaned up until after Cody was released on January 19.

29.    Video disclosed by the County failed to include the first nine hours of Cody's detention in the violent cell (see footnote 1 above).  After showing the first twenty minutes after Cody's arrival at the jail on the evening of the 17th, the video that was provided shows him being

thrown forcefully onto the floor in the violent cell by several officers, around 7:30 a.m. on the 18th.  This corroborates Cody's assertion that he was physically assaulted.

30.     Cody was temporarily removed from his cell the morning of the 18th for a bond hearing, in which he was unable to communicate with the judge due to his disability.  However, no guardian, parent, or other assistance was there to ensure Cody was effectively represented.

31.     Other than the time he was at the bond hearing, Cody was in the violent cell for the entire period he was detained at the jail.  It may be inferred that the County intentionally destroyed the first nine hours of video because it would have confirmed Cody's allegations of unlawful force, and that he had an episode of diarrhea that jail staff refused to clean up.

32.     During his time in custody, jailers also called Cody a "crybaby," indicating that they were aware of his disabilities and were using them as an excuse for cruel treatment.

33.     The fact that jail and medical staff knew about his disabilities is beyond question.  As noted above, they had been provided a list of medications along with the doctor's order to continue administering them.  Mary Albritton informed the staff about all of Cody's conditions.  Indeed, the initial reason for police contact was that Cody's disabilities were manifesting themselves in a way that was difficult for Mary to control.  Also, as noted above, Cody's inability to verbally communicate effectively is obvious.

34.     Furthermore, jail staff noted on Cody's intake questionnaire that they thought he had "mental retardation" and was "acting like a child."  They also noted that he was currently reporting hearing "voices that say bad things."

35.     Jail staff also made a "continuity of care query" (CCQ) for Cody, which returned an "exact match."  This query is required by law of all jails in Texas.  Its purpose is to identify individuals who have received mental health services from state programs.

8

36.    The CCQ system is administered by the Texas Department of Protective Services and coordinated with its law enforcement database, TLETS (Texas Law Enforcement Telecommunications System).

37.    When a staff member at a correctional institution runs a query, the system provides an immediate response through TLETS indicating if an exact match or possible match was located. If there is an exact or probable match, the system lists the name of the mental health provider that last provided services. This information is made immediately available to the individual at the jail who ran the query.

38.    The purpose of this system, as its name implies, is to maintain continuity of care for inmates in need of mental health services.  This parallels standards published by the National Commission on Correctional Health Care, which require jails to maintain continuity of care for individuals with serious mental health needs.[2]

39.    However, the jail failed to maintain any continuity of care for Cody.  Medical staff ignored written doctor's orders to continue giving Cody his medication.  Indeed, despite the fact that the extensive list provided by the doctor contained numerous medications that were obviously necessary to Cody's various, serious conditions, medical staff gave him *none* of them.  Instead, they prescribed him only Librium, noting that he would likely suffer withdrawal symptoms from not receiving his usual dosage of Xanax, which he had been prescribed for chronic anxiety and to assist sleeping.

40.    However, it does not appear that Cody was even given any Librium.  Surveillance footage confirms he was not given any medication whatsoever after 7:30 a.m. on the 18th.  This clearly contradicts the jail's medication administration records, which state he was given Librium

---

[2] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-E-09 ("Continuity and Coordination of Mental Health Care During Incarceration").

twice per day, beginning on the p.m. shift of the 18th through the p.m. shift on the 21st. However, Cody was released at 3:30 p.m. on the 19th. It may thus be inferred that the medication administration record is completely falsified.

41.     As such, on top of the other conditions Cody was subjected to, medical staff failed to administer their own prescribed Librium, knowing that Cody would be withdrawing from his daily Xanax prescription. This essentially guaranteed that Cody would be miserable and unable to sleep, especially given the 24-hour bright lighting and lack of any bedding.

42.     No doctor at the jail ever evaluated Cody. The Librium was instead prescribed by a licensed vocational nurse, whose scope of practice prohibited her by law from prescribing medication. As a cost-cutting measure, Southern Health Partners ("SHP") tasks its nurses with prescribing medication themselves based on written "protocols" that purport to pre-authorize medical treatments for certain situations, even when no medical practitioner authorized to prescribe medication has seen the patient.

43.     SHP is a private company that contracted with the County to provide medical care at the jail. All medical staff at the jail, other than mental health staff, are employed by SHP.

44.     Denying Cody his medications in their entirety for nearly 48 hours caused him to suffer tremendously, especially in combination with the horrific conditions he was subjected to in the violent cell.

45.     In addition to the psychological trauma described above—which only increased in intensity as time went on— it is also likely that Cody suffered an episode of atrial fibrillation while he was in jail. This can be caused by dehydration and stress, both of which were present in abundance. Cody normally takes medication daily to prevent atrial fibrillation, and it was included in the medications listed in the doctor's order, but it was not provided while he was in the jail.

46.     Moreover, SHP staff completely failed to monitor Cody while he was in the violent cell.  They never examined him, checked his vitals, or even spoke with him while he was in custody.

47.     That Cody was suffering and at serious risk to his mental and physical health would have been obvious to anyone who observed him.  For example, more than once, Cody disrobed completely without any apparent reason.  It was also known to all involved that he had not eaten or had anything to drink since he was taken into custody on the evening of the 17th.

### *The County and Taft Willfully Deprived All Inmates at the Jail of Access to Any Mental Health Care*

48.     Dr. Taft is the owner and primary practitioner of his psychology practice, Philip R. Taft Psy.D & Associates, PLLC.  The decisions of the PLLC regarding mental health care at the jail (or lack thereof) are Taft's decisions.   Thus, they are referred to interchangeably in this Complaint, and collectively as "Taft."

49.     As a threshold matter, the policies and practices of Taft are attributable to the County, because the County has a non-delegable duty to provide mental health care at the jail, and Taft is simply standing in the County's shoes when he provides that care instead.  Alternatively, the County fully delegated policymaking authority to Taft and/or collaborated with him in instituting their policies and practices.  The County was aware of Taft's regular policies and practices; all non-medical staff at the jail, including administrators, are County employees, and work with medical and mental health care staff regularly.  Also, Taft has had his contract renewed at least once, allowing an inference that the County was familiar with the manner in which he was fulfilling his contract and took no issue with it.

50.     Taft's contract with Henderson County was for approximately $75,000 per year. During the time period at issue, he had Kevin Jeffries handle all of his responsibilities under the

contract. He then paid Jeffries a portion of the contract proceeds and kept approximately 40% for himself as profit.

51.     However, Jeffries's only professional licensing is as a Licensed Chemical Dependency Counselor Intern. This limited license does not qualify Jeffries as a clinician who is legally authorized to provide general psychological services. Rather, an LCDC licensee (even without the "Intern" qualifier) is only authorized "to provide chemical dependency counseling services involving the application of the principles, methods, and procedures of the chemical dependency profession . . . . The license does not qualify an individual to provide services outside this scope of practice. . . . LCDCs are not qualified to treat individuals with a mental health disorder or provide family counseling to individuals whose presenting problems do not include chemical dependency."[3]

52.     In a related claim by another plaintiff, Taft previously testified that he provided no professional training to the staff person he had assigned to the jail.[4] Instead, the staff person was instructed on how to perform her duties by jail officials, who are not licensed psychologists or mental health professionals of any kind. Upon information and belief, Taft also provided no training to Jeffries and treated their professional relationship similarly.

53.     Further, no one from Taft's office directly supervised Jeffries in any way.

54.     Taft also provided no written policies or procedures for Jeffries to follow.

55.     In sum, Taft outsourced all of the clinician-level work required by the contract to an unqualified person, while contributing none of his own effort or expertise, but pocketed 40% of the contract price anyway. This conduct is expressly prohibited by Texas law.

---

[3] TEX. ADMIN. CODE § 140.402(a), (b)(4).
[4] This testimony was regarding Jeffries's predecessor, Jessica Phlips.

56.    Psychologists are limited by Texas law in how they may utilize unlicensed individuals.[5] They "may employ unlicensed individuals only to perform services which do not constitute the practice of psychology or the activities and services of another licensed profession. Permissible duties include: (1) Secretarial and clerical duties such as scheduling appointments or processing insurance forms; (2) Data gathering, such as administering, proctoring, or scoring non-projective tests, obtaining histories or obtaining documentation for record keeping purposes, provided that it does not require psychological education or involve the provision of psychological services; and (3) Technical, educational, or other duties that are adjunctive to and incorporated into the provision of psychological services such as providing educational information or assisting a client's work with a computer, special equipment or special materials, provided that the duties do not require psychological education or involve the provision of psychological services or the services or activities of another licensed profession."[6]

57.    In other words, unlicensed persons can only be used to assist the work of licensed clinical professionals, whose responsibility it is to provide psychological services.

58.    The National Commission on Correctional Health Care ("NCCHC") is an organization that publishes standards regarding the provision of health care in correctional facilities. These standards have been recognized nationally as describing the applicable minimum standards for correctional health care.[7]

59.    NCCHC defines "mental health staff" to include "qualified health care professionals who have received instruction and supervision in identifying and interacting with

---

[5] An LCDC is not a "licensee" under Chapter 465; therefore, Jeffries is an "unlicensed" individual with respect to how Taft may employ him.
[6] TEX. ADMIN. CODE § 465.4.
[7] *See Gates v. Cook*, 376 F.3d 323, 342–343 (injunction requiring a correctional facility "to comply with ACA and National Commission on Correctional Healthcare standards regarding mental health" affirmed as justified by the Eighth Amendment).

individuals in need of mental health care services." Jeffries did not meet this definition, as he received no instruction or supervision, nor was he a "qualified health care professional," which the NCCHC defines as someone who "by virtue of their education, credentials, and experience are permitted by law to evaluate and care for patients."[8] As described above, Jeffries was not permitted by Texas law to evaluate and care for patients.

60.     Despite the fact that Texas law prohibited Jeffries from providing psychological services, Taft employed him as the sole provider of mental health care at the jail. In other words, he was not providing any actual mental health care at the jail at all. As a result, inmates at the jail, including Cody, had no access to qualified mental health care. This is a clear breach of the standard of care and the duty Taft owed to the inmates at the jail, whom he took on as his patients when he agreed to provide their mental health care.

61.     Furthermore, Texas law states that "Licensees are responsible for ensuring that all individuals practicing under their supervision are competent to perform those services."[9] Taft's failure to ensure this was knowing and willful. The decision was based entirely on a desire to keep his costs as low as possible and maximize his own profit from the contract with Henderson County.

62.     In its Standards for Mental Health Services in Correctional Facilities, the NCCHC's first and most fundamental standard is that "inmates have access to care to meet their serious mental health needs."[10]

63.     The NCCHC Standards define "access to care" as "in a timely manner, a patient can be seen by a clinician, be given professional clinical judgment, and receive care that is

---

[8] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-A-02 ("Responsible Mental Health Authority").
[9] TEX. ADMIN. CODE § 465.9(f).
[10] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-A-01 ("Access to Care").

ordered."[11]  None of this was possible at the Henderson County Jail due to the total unavailability of any clinicians, i.e., anyone capable of providing professional clinical judgment.

64.    Texas law also requires the provision of mental health services at jails.[12]

65.    Taft and the County breached these standards by intentionally providing only a single, unlicensed, unqualified person to allegedly provide mental health care at the jail.  Worse, the system did not include Jeffries even contacting Taft for help or advice.

66.    Sheriff Botie Hillhouse and the other ranking officers at the jail knew that Jeffries had no license that would qualify him to provide clinical psychological services.   They were additionally aware from simple observation that he was unsupervised and the only person allegedly providing mental health care at the jail.  As such, it was the jail's **express policy** to deny its entire inmate population access to mental health care of any kind.

67.    Related to the above, the NCCHC states that "clinical decisions and actions regarding mental health care provided to inmates . . . are solely the responsibility of qualified mental health professionals. . . .**The intent of this standard is to ensure clinical decisions are made for clinical purposes and without interference from other personnel**."[13]

68.    As previously noted, "qualified mental health professionals" are those who "are permitted by law to evaluate and care for the mental health needs of patients."[14]   In other words, decisions regarding appropriate restrictions to prevent self-harm (or whether any such restrictions are necessary) must be made by someone capable of making clinical assessments.  Jeffries was

---

[11] *Id.*

[12] TEX. ADMIN. CODE § 273.1 ("The owner/operator of each facility shall provide medical, mental, and dental services in accordance with the approved health services plan.").

[13] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-A-03 ("Clinical Autonomy").

[14] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-A-02 ("Responsible Mental Health Authority").

not; the correctional officers were not. Again, not a single person at the jail was capable of making such decisions.

69.    Instead, all decisions regarding housing and other restrictions for an inmate identified as mental health issues or disabilities were made by correctional officers, who are even less qualified to make such decisions than Jeffries.

70.    Delegating these decisions to correctional officers completely undermines the standard of care described above. It not only allows the "interference from other personnel" the standard is intended to avoid, but *completely relies on it*.

71.    To illustrate this point, such deference to correctional officers resulted in the egregious treatment of another inmate in a separate incident. On approximately May 24, 2022, an inmate named Adriane Olvera was placed in the violent cell for suicide concerns. Within the first week, she was seen twice by Jeffries. After the second visit, Jeffries told Olvera that he did not believe she needed to remain on suicide watch. Nonetheless, Olvera was kept in the violent cell an additional 28 days without explanation—with no clothing, bedding, or items other than a suicide blanket, no regular access to a toilet, shower, sink, or basic human hygiene, and lights on in the cell 24-hours-per-day. Jeffries did not reassess Olvera or visit her for any reason after the first week.

72.    In short, the total failure to provide any qualified mental health care at the jail, as well as the total failure to have any policies in place addressing appropriate treatment and housing for individuals with intellectual disabilities or severe mental health issues, created a situation in which it was inevitable that individuals like Cody would not be appropriately housed or accommodated at the jail.

16

73.    Additionally, Cody suffered a mental health emergency that was ongoing throughout his detention.  However, the lack of policies regarding the appropriate treatment of individuals with mental disabilities, along with the lack of qualified mental health professionals or anyone else who could recognize and respond appropriately to mental health emergencies, left Cody to suffer through this emergency without any treatment or mitigation of the conditions causing it.

### *Medical Staff Completely Failed to Monitor Cody's Health*

74.    Placing an inmate in a secluded cell is inherently hazardous to that inmate's mental and physical health.  This is clear from the NCCHC standards, outlined above, as well as SHP's own written (but unfollowed) policies.

75.    It can be inferred from SHP's written policies that the standard of care requires medical staff to monitor the health of anyone placed in seclusion.  For example, these policies include:

- When an inmate is placed on medical observation, an observation schedule must be established using the "Medical Monitoring Flowsheet Form."

- Progress notes (notes made by nurses to document interactions with patients) should be used to document noteworthy changes in the inmate's condition.

- Vital signs should be taken at least once per shift (twice per 24-hour period).

- The Medical Director should be informed of any inmate placed on observation to ensure the appropriateness of the treatment plan, and should be kept abreast of any developments.

- Upon notification by correctional officers to medical staff of a patient's segregated status, the medical staff should see the patient initially to record his/her current

17

health status.   Medical staff must also review the patient's medical chart to determine if any existing medical needs would contradict such placement. Any findings must be reported to the Jail Administrator.

- When Medical Staff are on-site, referrals to the designated Qualified Mental Health Professional must be placed immediately (within 30 minutes).  The Jail Administrator must be notified of the patient's current status as well.

- Patients are to be re-assessed each day on a regular schedule to identify any change in condition or status.

76.     These official policies of SHP are similar to a number of the standards published by the NCCHC, further indicating that they reflect the standard of care.  Some of these standards are outlined above.  Additionally, in its Standards for Health Services in Jails, the NCCHC states its basic rule regarding seclusion as, "Any practice of segregation should not adversely affect an inmate's health."[15]  To serve that purpose, jail medical providers must utilize certain policies, such as:

- Upon notification that an inmate has been placed in segregation, a qualified health care professional reviews the inmate's health record.  If existing medical, dental, or mental health needs require accommodation, custody staff are notified.[16]

- Inmates in solitary confinement with little or no contact with other individuals are monitored daily by medical staff.[17]

- Observation by medical staff is documented.[18]

---

[15] Nat'l Comm. on Corr. Health Care, *Standards for Health Services in Jails*, J-G-02 ("Segregated Inmates").
[16] *Id.*
[17] *Id.*
[18] *Id.*

- Health staff promptly identify and inform custody officials of inmates who are physically or psychologically deteriorating.[19]

77.     In other words, the standard of care, taken as a whole, requires medical staff to take steps to ensure that a "practice of segregation [does] not adversely affect an inmate's health."

78.     The importance of such monitoring in this case was only increased by the fact that SHP staff was well aware of Cody's various mental disabilities and heart condition.  They were provided clear orders from a physician to give him his prescribed medication, and it was documented at intake that Cody was exhibiting "child-like behavior" and signs of "mental retardation."  Medical staff additionally knew that no qualified mental health care was available at the jail.

79.     Despite this knowledge, SHP medical staff failed to follow **any** of the above policies and/or standards.  Cody's medical file contains virtually no documentation whatsoever after he was placed in the violent cell, other than a few blood pressure readings taken by a correctional officer—not medical staff—in the first few hours of Cody's incarceration.  The single entry made by a nurse states that Cody was to remain in the violent cell indefinitely, based only on the orders of a correctional officer, and that he was supposed to be monitored by checking his vitals and ensuring compliance with prescriptions.  However, as described above, none of this monitoring was actually performed, and no medication was provided.

80.     Texas jails must follow the instructions of a physician.[20]  A reasonable medical professional adhering to the standard of care would not have allowed an at-risk individual with Cody's health conditions to languish for nearly two days in the violent cell, without food, water,

---

[19] *Id.*
[20] TEX. ADMIN. CODE § 273.3 ("All medical instructions of designated physicians shall be followed.").

basic human hygiene, bedding, or a reasonable opportunity to sleep. These abominable conditions were only exacerbated by the fact that Cody was not given any of his prescribed medication for his psychiatric conditions or cardiac health.

81.    Cody suffered tremendously during these two days in the violent cell; indeed, they may have been the worst two days of his life. He still suffers nightmares of the incident as a result, and is permanently terrified of law enforcement.

## V.    FIRST CAUSE OF ACTION: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

82.    All preceding paragraphs are incorporated here by reference.

83.    Title II of the Americans with Disabilities Act makes it unlawful for a public entity to discriminate against a qualified individual with a disability because of that disability.

84.    Cody Albritton is a qualified individual with multiple disabilities, namely, intellectual disability, schizo-affective disorder (bipolar type), obsessive-compulsive disorder, chronic insomnia, cardiomyopathy, and chronic systolic heart failure.

85.    Various members of jail staff, including medical staff, were abundantly aware that Cody was disabled. They were notified of this by Mary Albritton. The Texas Continuity of Care Query returned an exact match for him, meaning jail staff were aware that Cody had received mental health care at state-funded facilities. It was also noted more than once on Cody's intake records that he was "acting like a child," appeared mentally disabled, and was hearing voices. The guards called him a "crybaby," a clear reference to his child-like behavior. Moreover, his disability is obvious to anyone who communicates with him.

86.    Henderson County discriminated against him because of his intellectual and psychiatric disabilities by intentionally denying Cody, as well as all other inmates at the jail, access

20

to any mental health care at all. As described in detail above, the designated mental health provider, Dr. Taft, subcontracts all of his duties to a single person who is incapable of providing psychological services under Texas law or the NCCHC standards. Furthermore, this person is only at the jail approximately 30 hours per week. He never saw Cody.

87.    As a result, no qualified mental health professional ("QMHP") screened Cody for the appropriateness of housing him in the jail at all. Even if it were possible to humanely house Cody at the jail, no QMHP was available to determine what type of housing and/or restrictions would be appropriate or necessary. No QMHP was available to determine what accommodations would be necessary to while Cody was in detention. No QMHP (or anyone else, for that matter) monitored Cody during his detention to ensure his safety or wellbeing.

88.    Additionally, the jail has no policies in place to guide these kinds of decisions. It has no policies in place outlining appropriate housing or accommodations for people with intellectual or psychiatric disabilities. There is never a QMHP actually present at the jail, and at the time of the incident, the jail physician was not making regular appearances at the jail. Instead, the physician called in once a week, for a couple of hours, for the limited purpose of conducting telemedicine appointments with a select few patients. In other words, there is no professional medical or mental health oversight whatsoever to act as a check on the guards' decisions regarding disabled inmates.

89.    Instead, the policy is to simply detain individuals like Cody indefinitely in the violent cell, at the whim of the correctional officers. This cell has no bed, toilet, shower, or running water of any kind. Not even the most minimal bedding is provided, leaving a person to attempt to sleep on a bare concrete bench. The lights are additionally left on all night long, even when the

individual in question—such as Cody—is not being observed at regular intervals.[21]  Cody did not

sleep at all while he was at the jail—two full nights over the course of approximately 42 hours.

These deprivations have no justifiable purpose and are not forced on other, non-disabled inmates

at the jail.

90.    Cody was never allowed to leave the cell to use a toilet, wash his hands, take a

shower, brush his teeth, or participate in any other basic human hygiene activities.  The guards did

not even provide toilet paper to use when Cody relieved himself in the floor drain.

91.    Jail staff also did not offer Cody anything at all to drink for at least 32 consecutive

hours.  When Cody refused the food they offered (which they did not offer at every scheduled

meal), it was because he thought they were trying to poison him.  This was a direct manifestation

of his mental disabilities reacting to the terrifying situation he found himself in.  Nonetheless, jail

staff took no action, deciding to simply let him starve instead.  Subjecting anyone to these

conditions is unconscionable; here, it was also a direct response to the manifestation of Cody's

disabilities.  Cody should have been taken to a hospital immediately, once staff were aware that

he was not eating or drinking fluids.

92.    Jail medical staff also decided to ignore doctor's orders and withhold all of Cody's

medication.  This was clearly intentional, due to the fact that they prescribed him Librium for the

withdrawal they knew he would suffer from being without his prescription for Xanax.  However,

even the Librium was not actually provided.

93.    Cody needs his prescribed medication to be comfortable in the best of times.

Denying him those medications completely during what were perhaps the worst two days of his

---

[21] Even if an inmate is being observed overnight for his own safety, leaving the lights on at full
brightness without reprieve is unnecessary and cruelly deprives that person of a reasonable chance
at sleeping.

life is nothing short of sadistic.  Cody sees the world much like a small child would; this horrible series of events combined with the denial of his medication caused him to hallucinate that his parents were dead, and he would never see him again.  Cody had no understanding that he would eventually be released.   It is also likely that Cody experienced atrial fibrillation, a highly uncomfortable heart issue, due to stress, dehydration, and being denied his heart medication.

94.    Early in his detention, Cody had diarrhea in the cell, which ended up on the bench due to the lack of a toilet.  No one cleaned it up, and it stayed in a pool on the bench for at least the last 32 hours of Cody's detention.

95.    Finally, correctional officers used unreasonable amounts of force against Cody in the course of his detention in response to the manifestation of his mental disabilities.   Video surveillance shows him being thrown forcefully onto the floor of the cell after being brought back from a bond hearing, for no reason whatsoever.

96.    In short, because of his disabilities, Cody was subjected to numerous instances of intentional discrimination and deprivations by jail staff, which other non-disabled inmates are not subjected to.

97.    Additionally, the County made a willful decision to forego providing any mental health care that complies with Texas law, and further failed to have any policies in place to ensure people with mental disabilities are housed safely and appropriately at the jail.  These fundamental policy failures intentionally discriminate against an entire class of disabled individuals, including Cody.

## VI.    SECOND CAUSE OF ACTION: VIOLATION OF INMATE'S RIGHTS UNDER 42 U.S.C. § 1983

98.    All preceding paragraphs are incorporated here by reference.  **Plaintiff does not assert any claims under § 1983 against SHP at this time, but reserves the right to add such claims in the future.**

### *The Taft Defendants*

99.    The Taft Defendants, as private actors contracted by the County to provide mental health care at the Jail, are state actors under § 1983.

100.    Taft's system of mental health care at the jail was grossly inadequate and failed to comply with any recognized standards for correctional mental health care, some of which are described above.  The constitution requires jails to provide a minimum level of mental health care, which the Fifth Circuit has found to be described in the NCCHC standards.[22]

101.    In short, Taft failed this requirement by providing no legally qualified mental health care at the jail at all.  This fundamental failure prevented any inmates at the jail, including Cody Albritton, from being assessed by someone qualified to determine appropriate housing and treatment for someone with severe mental health issues and intellectual disability, like Cody.

102.    Instead, Taft left all such decisions to wholly unqualified correctional officers.  This is a serious, fundamental breach of Taft's duty to his patients.

103.    At the same time, no one at the jail was qualified to recognize mental health emergencies when they occurred, and Taft had no policies in place to deal with any such emergencies.

---

[22] *See Gates v. Cook*, 376 F.3d 323, 342–343 (injunction requiring a correctional facility "to comply with ACA and National Commission on Correctional Healthcare standards regarding mental health" affirmed as justified by the Eighth Amendment).

104.    Put another way, under Taft's and the County's direction, the jail had no policies in place, and no qualified personnel in place, to appropriately handle someone with severe mental health issues and intellectual disability, like Cody.  As a result, correctional officers and medical staff allowed Cody to suffer in the violent cell for nearly two full days, with no water, no toilet, no basic human hygiene support, no bedding, and lights on 24-hours-per-day.

105.    This lack of policies also allowed medical staff to withhold all of Cody's medication without any oversight by a physician or qualified mental health care professional.

106.    Such conditions have no justifiable purpose and are therefore unlawful punishment of a pretrial detainee such as Cody.

107.    These policies (or lack thereof) were adopted by Taft with deliberate indifference to the rights of inmates such as Cody.  This is evident from the fact that they fall far short of the NCCHC standards, of which Taft should have been aware as a psychologist providing correctional mental health care.  Standards aside, it is obvious to any psychologist that a person unqualified to provide psychological services under Texas law cannot be the sole provider of such services at a jail.

108.    Furthermore, having inmates with severe mental health issues and intellectual disability pass through the jail is an inevitability, and an issue that correctional officers were certain to face repeatedly.  It was a highly foreseeable consequence that having no policies, training, or qualified personnel in place to handle such an inevitability would lead to constitutional violations, such as those alleged in this lawsuit.  Even worse, Cody is precisely the type of inmate–patient who needed Taft's help the most, as the designated mental health care provider at the jail.

109.    Failing to have such policies, training, or qualified personnel therefore amounts to deliberate indifference to the rights of inmates, including Cody.

25

110.    Therefore, the Taft Defendants can be liable under § 1983 for deciding, in their supervisory and/or policymaking capacity, to institute the fundamentally flawed (or more precisely, non-existent) system of mental health care described above.[23]

### *Henderson County*

111.    The claims described above against the Taft Defendants are invoked equally against Henderson County, which is responsible for the unlawful policies of its private contractor (or alternatively, the contractor's policies are in fact the policies of the County).  The County has a non-delegable duty to provide care to its inmates at the jail.

## VII.    THIRD CAUSE OF ACTION: NEGLIGENCE

112.    All preceding paragraphs are incorporated herein by reference.

113.    The Taft Defendants and SHP, as well as their employees at the jail, were contracted medical providers for the Henderson County Jail.  Therefore, they had duties to provide competent care to Cody Albritton while he was detained at the jail.

114.    Employees of SHP breached their duties by failing to meet the standard of care for treating Cody Albritton, an inmate–patient under their care with multiple known psychiatric disorders and serious heart conditions.   SHP is vicariously liable for the conduct of their employees, which was performed entirely within the course and scope of their employment.

### *The Taft Defendants*

115.    As described at length above, Taft's system of mental health care at the Jail was functionally non-existent.  The allegations described above supporting claims of unconstitutional conditions of confinement also support claims of negligence.

---

[23] Note that the fact Taft failed to *actually* supervise the mental health care at the jail does not relieve him of his duty to do so, which he took on when he contracted with the County to provide the mental health care at the jail.

116.    In short, the jail had no policies in place, and no qualified personnel in place, to appropriately handle someone with severe mental health issues and intellectual disability, like Cody.  Additionally, there was no professional oversight to act as a check decisions made by the wholly unqualified correctional officers.  As a result, correctional officers and medical staff allowed Cody to suffer in the violent cell for nearly two full days, with no water, no toilet, no basic human hygiene support, no bedding, and lights on 24-hours-per-day.

117.    Taft's actions and/or inactions were the cause-in-fact and proximate cause of serious harms suffered by Cody Albritton, including but not limited to physical and mental suffering during and after nearly two days of isolated confinement, sleep deprivation, dehydration, dangerously unsanitary conditions, deprivation of access to even the most basic elements of personal hygiene, and a deprivation of his previously prescribed psychiatric medications.

### Taft: Gross Negligence

118.    As described above, Taft's system of providing mental healthcare at the Jail was grossly inadequate.

119.    Having inmates with severe mental health issues and intellectual disability pass through the jail is an inevitability, and an issue that correctional officers were certain to face repeatedly.  It was a highly foreseeable consequence that having no policies, training, or qualified personnel in place to handle such an inevitability would lead to constitutional violations, such as those alleged in this lawsuit.  Even worse, Cody is precisely the type of inmate–patient who needed Taft's help the most, as the designated mental health care provider at the jail.

120.    Failing to have such policies, training, or qualified personnel therefore amounts to a deliberate decision to ignore a serious risk to the health of inmates with severe mental health issues and intellectual disability, including Cody.

27

121.    These failures directly harmed Cody Albritton, as described above.

### *SHP*

122.    SHP staff ignored written doctor's orders to continue giving Cody his numerous prescribed medications, which were essential due to his serious psychiatric disorders and heart condition.  None of his medications were provided at any time during his detention.  This failure is harmful in and of itself, as Cody will suffer both physically and psychologically as a result of his various disabilities without regular medication.  Withholding his medications is especially harmful in combination with the dehydration and stress Cody was known to be suffering as a result of the conditions of the violent cell.  These conditions combined to cause tremendous mental trauma, and likely atrial fibrillation.

123.    Additionally, SHP staff at the Jail completely failed to monitor the health and general wellbeing of Cody Albritton, an inmate–patient under their care.  This is despite the fact that Cody was ostensibly on SHP's benzodiazepine withdrawal protocol, was observed to be exhibiting child-like behavior, and returned an exact match on the mental health Continuity of Care Query.   SHP also knew Cody suffered from various psychiatric and cardiac conditions, for which they were intentionally withholding his medication.

124.    This total failure breached the standard of care reflected in both SHP's own written policies and the nationally recognized NCCHC standards.

125.    Beyond the monitoring dictated by written policy, SHP should have been alerted to the danger to Cody's health posed by confinement in the violent cell, because they were aware that this cell had no toilet, shower, or running water.  Furthermore, the violent cell is directly observable from the nurses' station, so they would have known that Cody was not being let out of his cell to take a shower, use a toilet, or for any other reason.

126.    Had they paid even the most cursory attention to Cody, they would have noticed his mental state and general wellbeing deteriorated significantly after being placed in the violent cell, including the fact that he was not eating or drinking fluids.  This should have been reported to Taft, the SHP physician, or jail administration, who would then have ordered further professional examination of Cody and appropriate treatment, housing, and/or conditions of his confinement.

127.    SHP's actions and/or inactions were the cause-in-fact and proximate cause of serious harms suffered by Cody, as described above.

## VIII.    DAMAGES

128.    As a direct and proximate result of the above-described acts and omissions of Defendants, and/or individuals for whom the Defendants are legally responsible, Cody Albritton has suffered serious damages.  Accordingly, Plaintiff Mary Albritton, as Cody's next friend, seeks to recover all actual, compensatory, and exemplary damages which have resulted from Defendants' above-described conduct.  These damages include, but are not necessarily limited to, the following:

a)  Physical suffering;

b)  Mental pain and anguish, both past and future;

c)  The cost of medical care and/or counseling necessitated by the harms done to him;

d)  Punitive damages against all Defendants, where applicable;

e)  Pre- and post-judgment interest in accordance with Texas law.

## IX.    JURY DEMAND

129.    Plaintiff demands a trial by jury.

29

## X.    <u>RELIEF REQUESTED</u>

130.    For the reasons stated above, Plaintiff Mary Albritton, as next friend of Cody Albritton, requests that Defendants be summoned to appear and answer herein and that upon final trial or hearing, a judgment be entered in favor of the Plaintiff and against the Defendants as follows:

a) Awarding Plaintiff actual damages in an amount that is within the jurisdictional limits of this Court;

b) Awarding Plaintiff punitive or exemplary damages in an amount that is within the jurisdictional limits of this Court;

c) Awarding Plaintiff reasonable and necessary attorney's fees and costs of court;

d) Awarding Plaintiff pre-judgment interest at the highest rate permitted by law;

e) Awarding Plaintiff post-judgment interest at the highest rate permitted by law; and

f) Awarding Plaintiff all such other and further relief, at law or in equity, to which he may show himself to be entitled.

Respectfully submitted,

/s/ *Roger Topham*
Roger Topham
State Bar #24100557
13809 Research Blvd. Suite 500
Austin, Texas 78750
(512) 987-7818
rt@tophamlaw.com